KEVIN D. RISING (SBN 211663)
kevin.rising@btlaw.com
GARRETT S. LLEWELLYN (SBN 267427)
garrett.llewellyn@btlaw.com
BARNES & THORNBURG LLP
2029 Century Park East, Suite 300
Los Angeles, California  90067
Telephone: (310) 284-3880
Facsimile: (310) 284-3894

E. B. CHILES IV (pro hac vice)
cchiles@qgtlaw.com
CHAD W. PEKRON (pro hac vice)
cpekron@qgtlaw.com
R. RYAN YOUNGER (pro hac vice)
ryounger@qgtlaw.com
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone:  (501) 379-1700
Facsimile: (501) 379-1701

Attorneys for Defendants/Counter-Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JIMMY ESEBAG, an individual, | Case No.  2:18-cv-08446-R-RAO |
| Plaintiff, | |
| vs. | **DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW** |
| JUSTIN WHALEY, an individual; RODNEY REDMAN, an individual; RON WHALEY, an individual; M. SEAN HATCH, an individual; MICHAEL BAHN, an individual; JODIE DANIELS, an individual; TOM MADDI, an individual; | |
| | Final Pre-Trial Conference:  December 9, 2019 |
| Defendants. | |
| and | Trial Date: January 7, 2020 |
| JUSTIN WHALEY, an individual; RODNEY REDMAN, an individual; RON WHALEY, an individual; M. M. SEAN HATCH, an individual; MICHAEL BAHN, an individual; JODIE DANIELS, an individual, | |

1  TOM MADDI, an individual,

2                         Counter-Plaintiffs,

3  vs.

4  JIMMY ESEBAG, an individual,
   AND UNITED LICENSING
5  GROUP, INC., a California
   corporation.

6
                          Counter-Defendants.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1

## <u>TABLE OF CONTENTS</u>

2   I.      INTRODUCTION ........................................................................................1

3   II.     SUMMARY OF MR. ESEBAG'S CLAIM ..............................................1

4   III.    CONTENTIONS OF LAW AS TO MR. ESEBAG'S CLAIM.....................1

5           A.      Claim 1 – Breach of Written Contract. ...........................................1

6   IV.     SUMMARY OF THE GYDE INDIVIDUALS' DEFENSES .........................2

7   V.      CONTENTIONS OF LAW AS TO THE GYDE INDIVIDUALS'
            DEFENSES ...............................................................................................2
8
9           A.      Affirmative Defense – Failure to State A Claim Upon Which Relief
                    Can Be Granted. ..............................................................................2

10          B.      Affirmative Defense – Agreement Void Because Obtained by
                    Fraudulent Means.............................................................................2
11
12          C.      Affirmative Defense – Agreement Void or Voidable Because Shares of
                    ULG Were Not Registered.................................................................4

13          D.      Affirmative Defense – Excuse of Performance. ...............................5

14          E.      Affirmative Defense – Waiver...........................................................5

15  VI.     SUMMARY OF THE GYDE INDIVIDUALS' COUNTER-CLAIMS .........6

16  VII.    CONTENTIONS OF LAW AS TO THE GYDE INDIVIDUALS'
            COUNTER CLAIMS .................................................................................6
17
18          A.      Counter-Claim 1 – Violations of §10b of The Securities Exchange Act
                    and Rule 10b-5. ................................................................................6

19          B.      Counter-Claim 2 – Violations of Sections 5 and 12 of The Securities
                    Act. ...................................................................................................7
20
21          C.      Counter-Claim 3 – Violations of Section 25401 of The California
                    Corporations Code. ..........................................................................7

22          D.      Counter-Claim 5 – Common Law Fraud. .........................................8

23          E.      Counter-Claim 6 – Unjust Enrichment. .........................................10

24          F.      Counter-Claim 7 – Unfair Competition. .......................................10

25  VIII.   SUMMARY OF MR. ESEBAG'S DEFENSES .........................................10

26  IX.     CONTENTIONS OF LAW AS TO MR. ESEBAG'S DEFENSES..............11

27          A.      Affirmative Defense – Parol Evidence Rule....................................11

28          B.      Affirmative Defense – Estoppel......................................................11

i

C.     Affirmative Defense – Waiver. .................................................. 12

D.     Affirmative Defense – Unclean Hands. ..................................... 12

E.     Affirmative Defense – Opinion. ............................................... 13

F.     Affirmative Defense – Statute of Frauds. ................................. 13

G.    Affirmative Defense – Failure to Mitigate Damages. .............. 15

H.    Affirmative Defense – Consent. ............................................... 15

I.     Affirmative Defense – Business Judgment Rule. ..................... 15

X.    THE GYDE INDIVIDUALS' KEY EVIDENCE IN OPPOSITION TO MR. ESEBAG'S CLAIMS AND IN SUPPORT OF THIER RELATED AFFIRMATIVE DEFENSES ................................................................. 16

    A.    Summary of Evidence. ............................................................. 16

        i.    The Parties. ...................................................................... 16

        ii.   The Pitch of Dr. Boost to the Gyde Individuals. .............. 16

        iii.  The Gyde Individuals' Agreement to Invest in ULG. ...... 18

        iv.  The Memorandum of Understanding. ............................... 21

        v.   Mr. Esebag's Attempts to Acquire Additional Funds Before His Scheme Unraveled. .................................................. 22

    B.    Mr. Esebag's Claim 1 – Breach of Written Agreement. ...................... 24

    C.    The Gyde Individuals' Affirmative Defense – Failure to State A Claim Upon Which Relief Can Be Granted. ..................................... 26

    D.    The Gyde Individuals' Affirmative Defense – Agreement Void Because Obtained by Fraudulent Means. ........................................... 26

    E.    The Gyde Individuals' Affirmative Defense – Agreement Void or Voidable Because Shares of ULG Were Not Registered. ................... 29

    F.    The Gyde Individuals' Affirmative Defense – Excuse of Performance. ................................................................................................ 30

    G.    The Gyde Individuals' Affirmative Defense – Waiver. ...................... 30

XI.   SUMMARY OF KEY EVIDENCE IN SUPPORT OF THE GYDE INDIVIDUALS' CLAIMS AND IN OPPOSITION TO MR. ESEBAG'S DEFENSES ................................................................................................. 30

    A.    Summary of Evidence. ............................................................. 30

    B.    The Gyde Individuals' Counter-Claim 1 – Violations of §10b of the Securities Exchange Act and Rule 10b-5. ................................... 30

C.   The Gyde Individuals' Counter-Claim 2 – Violations of Section 5 and 12 of The Securities Act. .......................................................31

D.   The Gyde Individuals' Counter-Claim 3 – Violations of Section 25401 of The California Corporations Code. ...................................31

E.   The Gyde Individuals' Counter-Claim 5 – Common Law Fraud........31

F.   The Gyde Individuals' Counter-Claim 6 – Unjust Enrichment..........31

G.   The Gyde Individuals' Counter-Claim 7 – Unfair Competition.........32

H.   Mr. Esebag's Affirmative Defense 1 – Parol Evidence Rule. .............32

I.   Mr. Esebag's Affirmative Defense 2 – Estoppel. ...............................32

J.   Mr. Esebag's Affirmative Defense 3 – Waiver. ..................................32

K.   Mr. Esebag's Affirmative Defense 4 – Unclean Hands. .....................32

L.   Mr. Esebag's Affirmative Defense 5 – Opinion. ................................32

M.   Mr. Esebag's Affirmative Defense 6 – Statute of Frauds....................32

N.   Mr. Esebag's Affirmative Defense 7 – Failure to Mitigate Damages. 33

O.   Mr. Esebag's Affirmative Defense 8 – Consent. ................................33

P.   Mr. Esebag's Affirmative Defense 9 – Business Judgment Rule........33

XII.   ANTICIPATED EVIDENTIARY ISSUES ...................................................33

XIII.   BIFURCATION OF ISSUES.........................................................................33

XIV.   STATEMENT AS TO JURY TRIAL.............................................................33

XV.   ATTORNEY'S FEES.....................................................................................33

XVI.   ABANDONMENT OF ISSUES ....................................................................33

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

iii

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Barnes v. State Farm Mut. Auto. Ins. Co.*,
16 Cal. App. 4th 365 (1993) ................................................................. 15

*Brown v. Grimes*,
192 Cal. App. 4th 265 (2011) .................................................................. 5

*Cyclone USA, Inc. v. LL&C Dealer Services, LLC*,
2007 WL 9662337 (C.D. Cal., Nov. 8, 2007) ................................... 6, 12

*Directors of Motion Picture Industry Pension Plan v. Nu Image Inc.*,
2014 WL 808859 (C.D. Cal. 2014) ...................................................... 12

*Ever Win Int'l Corp. v. Premier Accessory Grp., LLC*,
2016 WL 11263125 (C.D. Cal. 2016) ................................................... 10

*F.D.I.C. v. Castetter*,
184 F.3d 1040 (9th Cir. 1999) .............................................................. 33

*F.D.I.C. v. Van Dellen*,
2012 WL 4815159 (C.D. Cal. 2012) ..................................................... 15

*IIG Wireless, Inc. v. Yi*,
22 Cal. App. 5th 630, 644-45 (2018) .............................................. 11, 28

*Insurance Company of the State of Pennsylvania v. Citizens of
Humanity LLC*,
2014 WL 12689271 (C.D. Cal. 2014) ................................................... 15

*Intamin, Ltd. v. Magnetar Technologies Corp.*
623 F.Supp.2d 1055 (C.D. Cal. 2009), *aff'd* 404 Fed. Appx. 496
(Fed. Cir. 2010) .................................................................................... 12

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (2003) ....................................................................... 10

*MAG Aerospace Indus., LLC v. Precise Aerospace Mfg., Inc.*,
2019 WL 3306010 (C.D. Cal. July 23, 2019) ......................................... 5

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

*Mohebbi v. Khazen*,
  50 F. Supp. 3d 1234 (N.D. Cal. 2014)............................................................. 4, 7

*MTC Electronic Technologies Co., Ltd. v. Leung*,
  876 F.Supp. 1143 (C.D. Cal. 1995)........................................................................ 8

*POM Wonderful LLC v. Coca Cola Company*,
  166 F.Supp.3d 1085 (C.D. Cal. 2016).................................................................. 12

*Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*,
  55 Cal. 4th 1169 (2013).............................................................11, 27, 28, 32

*S.E.C. v. CMKM Diamonds, Inc.*,
  729 F.3d 1248 (9th Cir. 2013)............................................................................ 4, 7

*S.E.C. v. Murphy*,
  626 F.2d 633 (9th Cir. 1980)................................................................................ 25

*Thrifty Payless, Inc. v. The Americana at Brand, LLC*,
  218 Cal. App. 4th 1230 (2013)....................................................................... 11, 28

**Statutes**

Cal. Civ. Code, § 1624............................................................................................ 15

Cal. Bus. & Prof. Code § 17200, *et. seq*.............................................................. 10

Cal. Corp. Code § 2540 ............................................................................................ 8

Cal. Corp. Code §§ 25110 and 25503 .................................................................... 33

Cal. Corp. Code § 25401 .................................................................................*passim*

Securities Act Sections 5 and 12 .....................................................................*passim*

Securities Exchange Act § 10b...................................................................... 1, 6, 30

**Other Authorities**

17 C.F.R. §§ 230.500 *et seq*. ................................................................................. 25

17 C.F.R. §§ 230.504 and 505 ............................................................................... 25

CACI 303 ................................................................................................................... 2

CACI 335 .................................................................................................. 3

CACI 358 ................................................................................................ 15

CACI 1900 ............................................................................................... 9

CACI 1901 ............................................................................................... 9

CACI 1902 ............................................................................................. 10

CACI 1904 ............................................................................................. 13

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

## MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to Federal Rule of Civil Procedure 16, Central District of California Local Rule 16, and the Court's Civil Jury Trial Order, Defendants and Counter-Plaintiffs Justin Whaley, Rodney Redman, Ron Whaley, M. Sean Hatch, Michael Bahn, Jodi Daniels, and Tom Maddi (collectively the "Gyde Individuals") submit the following Memorandum of Contentions of Fact and Law.

## I.   INTRODUCTION

This case involves an investment by the Gyde Individuals in United Licensing Group ("ULG"), a company Jimmy Esebag wholly owned.  Mr. Esebeg sold the Gyde Individuals a 25% equity interest in ULG through misrepresentations and omissions about Dr. Boost, ULG's sole product; the shares that Mr. Esebag sold the Gyde Individuals were also securities.  When the Gyde Individuals learned the truth, Mr. Esebag sued them for breach of contract.  The Gyde Individuals have counterclaimed and asserted violations of § 10b of the Securities Exchange Act and Rule 10b-5, violations of Sections 5 and 12 of the Securities Act, violations of Section 25401 of the California Corporations Code, common law fraud, unjust enrichment, and unfair competition.  The Gyde Individuals are entitled to recession, as well as compensatory and punitive damages.

## II.   SUMMARY OF MR. ESEBAG'S CLAIM

Mr. Esebag contends the Gyde Individuals are liable for breach of contract. His claim, however, is contrary to federal and California law.

## III.   CONTENTIONS OF LAW AS TO MR. ESEBAG'S CLAIM

### A.   Claim 1 – Breach of Written Contract.

Elements: To establish a claim for breach of contract, Mr. Esebag must prove:

(1)   That Mr. Esebag and the Gyde Individuals entered into a contract;

(2)   That Mr. Esebag did all, or substantially all, of the significant things that the contract required him to do or that he was excused from doing those things;

1

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

(3)   That all conditions required by the contract for the Gyde Individuals' performance had occurred or were waived/excused;

(4)   That the Gyde Individuals failed to do something that the contract required them to do or that the Gyde Individuals did something that the contract prohibited them from doing;

(5)   Mr. Esebag was harmed by the Gyde Individuals' act or omission; and

(6)   That the Gyde Individuals' breach of contract was a substantial factor in causing Mr. Esebag's harm.

Source: Judicial Council of California Civil Jury Instructions ("CACI") 303.

## IV.   SUMMARY OF THE GYDE INDIVIDUALS' DEFENSES

In defense to Mr. Esebag's claim for breach of contract, the Gyde Individuals assert that they did not breach the contract, Mr. Esebag has failed to state a claim upon which relief can be granted, the agreement is void because it was obtained through fraud, the agreement is void or voidable because Mr. Esebag sold unregistered securities, performance by the Gyde Individuals is excused, and Mr. Esebag has waived performance.  Based on these defenses and the counterclaims discussed in Section VII, the Gyde Individuals are entitled to recession, as well as compensatory and punitive damages.

## V.   CONTENTIONS OF LAW AS TO THE GYDE INDIVIDUALS' DEFENSES

### A.   Affirmative Defense – Failure to State A Claim Upon Which Relief Can Be Granted.

Element: The breach of contract claim must be dismissed if Mr. Esebag has failed to state a claim upon which relief can be granted.

Source: Fed. R. Civ. P. 12(b)(6).

### B.   Affirmative Defense – Agreement Void Because Obtained by Fraudulent Means.

Elements:   To establish that no contract was created because the Gyde

Individuals' consent was obtained by fraud, the Gyde Individuals must prove:

(1)     That Mr. Esebag made a false representation;

(2)     That Mr. Esebag knew that the representation was not true;

(3)     That Mr. Esebag made the representation to persuade the Gyde Individuals to agree to the contract;

(4)     That the Gyde Individuals reasonably relied on this representation; and

(5)     That the Gyde Individuals would not have entered into the contract if they had known that the representation was not true.

OR

(1)     That Mr. Esebag intentionally concealed an important fact from the Gyde Individuals, creating a false representation;

(2)     That Mr. Esebag knew that the representation was not true;

(3)     That Mr. Esebag made the representation to persuade the Gyde Individuals to agree to the contract;

(4)     That the Gyde Individuals reasonably relied on this representation; and

(5)     That the Gyde Individuals would not have entered into the contract if they had known that the representation was not true.

OR

(1)     That Mr. Esebag made a promise the he did not intend to perform;

(2)     That Mr. Esebag knew that the promise was not true;

(3)     That Mr. Esebag made the promise to persuade the Gyde Individuals to agree to the contract;

(4)     That the Gyde Individuals reasonably relied on this promise; and

(5)     That the Gyde Individuals would not have entered into the contract if they had known that promise was not true.

Source: CACI 335 Affirmative Defense – Fraud.

California's Blue Sky Law also applies.

Elements:  To establish violations of Section 25401 of the California

Corporations Code, the Gyde Individuals must prove:

> (1)    Mr. Esebag sold stock in California;
>
> (2)    In the course of so doing, Mr. Esebag made an untrue statement of material fact or omission of material fact.

Source: *MTC Electronic Technologies Co., Ltd. v. Leung,* 876 F.Supp. 1143, 1147 (C.D. Cal. 1995) ("In order to have a valid cause of action under California Corporations Code § 2540 MTC must allege that there was a sale or purchase of stock in California by fraudulent untrue statements or by omitting material facts that would by omission make the statements misleading."); Cal. Corp. Code, § 25401 ("It is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.")

## C.    Affirmative Defense – Agreement Void or Voidable Because Shares of ULG Were Not Registered.

Elements: The Gyde Individuals allege that the contract is void or voidable because the shares of ULG were not registered with the Securities and Exchange Commission in violation of Section 5 and 12 of the Securities Act. To establish this defense, the Gyde Individuals must show:

> (1)    Mr. Esebag offered or sold securities;
>
> (2)    Mr. Esebag used an instrument of interstate commerce in connection with the offer or sale of a security;
>
> (3)    Without prior registration with the SEC.

Source: *Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1247 (N.D. Cal. 2014) ("To plead a violation of these statutes, a party must allege (1) the offer or sale of securities, (2) in interstate commerce, (3) without prior registration with the SEC."); *S.E.C. v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013) ("To establish

a prima facie case for violation of Section 5, the SEC must show that (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly sold or offered to sell securities; and (3) the sale or offer was made through interstate commerce.").

### D.     Affirmative Defense – Excuse of Performance.

Elements: The Gyde Individuals state that they are excused from performance under the contract by Mr. Esebag's material breaches of the contract.  To establish this defense, the Gyde Individuals' must show:

    (1)    Mr. Esebag materially breached the contract; and

    (2)    The Gyde Individuals' non-performance was excused thereby.

Source: *Brown v. Grimes,* 192 Cal. App. 4th 265, 277–279 (2011) ("When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract."); *MAG Aerospace Indus., LLC v. Precise Aerospace Mfg., Inc.*, 2019 WL 3306010, at *8 (C.D. Cal. July 23, 2019) (Hon. G. Klausner, presiding) (citing *Brown*).

### E.     Affirmative Defense – Waiver.

Elements:  To establish the affirmative defense of waiver, the Gyde Individuals must prove:

    (1)    That Mr. Esebag knew the Gyde Individuals were required to make certain payments under the contract; and

    (2)    That Mr. Esebag freely and knowingly gave up his right to have the Gyde Individuals perform these obligations.

A waiver may be oral or written or may arise from conduct that shows that Mr. Esebag gave up that right.

If the Gyde Individuals prove that Mr. Esebag gave up his right to the Gyde Indiviudals' payments under the contract then the Gyde Individuals were not required to perform this obligation.

Source: CACI 336 Affirmative Defense – Waiver; *Cyclone USA, Inc. v. LL&C Dealer Services, LLC*, 2007 WL 9662337, *20 (C.D. Cal., Nov. 8, 2007).

## VI.    SUMMARY OF THE GYDE INDIVIDUALS' COUNTER-CLAIMS

The Gyde Individuals assert claims for violations of § 10b of the Securities Exchange Act and Rule 10b-5, violations of Sections 5 and 12 of the Securities Act, violations of Section 25401 of the California Corporations Code, common law fraud, unjust enrichment, and unfair competition.  Based on these counterclaims, the Gyde Individuals are entitled to recession, as well as compensatory and punitive damages.[1]

## VII.   CONTENTIONS OF LAW AS TO THE GYDE INDIVIDUALS' COUNTER CLAIMS

### A.    Counter-Claim 1 – Violations of §10b of The Securities Exchange Act and Rule 10b-5.

Elements: The Gyde Individuals allege that Mr. Esebag defrauded them by means of material misrepresentations or omissions regarding their ULG investment. To establish their 10b-5 claim, the Gyde Individuals must prove:

(1)    Mr. Esebag:

      a. employed a device, scheme or artifice to defraud; or

      b. made an untrue statement of a material fact; or

      c. omitted a material fact necessary under the circumstances to keep the statements that were made from being misleading; or

      d. engaged in an act, practice or course of business that operated as a fraud or deceit in connection with the sale of securities;

(2)    Mr. Esebag acted knowingly;

(3)    Mr. Esebag used or caused the use of an instrumentality of interstate commerce, such as mail or telephone in connection with the sale of

---

[1] In discussing the Gyde Individuals' counterclaims and the defenses to their counterclaims, the Gyde Individuals refer to Mr. Esebag for ease of reading.  The counterclaims, however, are against Mr. Esebag and ULG, and the defenses are asserted by Mr. Esebag and ULG.

securities, regardless whether the instrumentality itself was used to make an untrue statement or a material omission;

(4)     The Gyde Individuals justifiably relied on Mr. Esebag's untrue statement of a material fact or omission to state a necessary material fact in buying securities; and

(5)     Mr. Esebag's conduct, misrepresentation, or omission caused the Gyde Individuals to suffer damages.

Source:  Ninth Circuit Model Jury Instruction No. 18.2 and related authority.

**B.      Counter-Claim 2 – Violations of Sections 5 and 12 of The Securities Act.**

Elements: To establish violations of Sections 5 and 12 of the Securities Act, the Gyde Individuals must prove:

(1)     Mr. Esebag offered or sold securities;

(2)     Mr. Esebag used an instrument of interstate commerce in connection with the offer or sale of a security;

(3)     Without prior registration with the SEC.

Source: *Mohebbi v. Khazen*, 50 F. Supp.3d at 1247 ("To plead a violation of these statutes, a party must allege (1) the offer or sale of securities, (2) in interstate commerce, (3) without prior registration with the SEC."); *CMKM Diamonds*, 729 F.3d at 1255 ("To establish a prima facie case for violation of Section 5, the SEC must show that (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly sold or offered to sell securities; and (3) the sale or offer was made through interstate commerce.").

**C.      Counter-Claim 3 – Violations of Section 25401 of The California Corporations Code.**

Elements: To establish violations of Section 25401 of the California Corporations Code, the Gyde Individuals must prove:

(1)     Mr. Esebag sold stock in California;

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

(2)     In the course of so doing, Mr. Esebag made an untrue statement of material fact or omission of material fact.

Source: *MTC Electronic Technologies Co., Ltd. v. Leung,* 876 F.Supp. 1143, 1147 (C.D. Cal. 1995) ("In order to have a valid cause of action under California Corporations Code § 2540  MTC must allege that there was a sale or purchase of stock in California by fraudulent untrue statements or by omitting material facts that would by omission make the statements misleading."); Cal. Corp. Code, § 25401 ("It is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.")

**D.     Counter-Claim 5 – Common Law Fraud.**

Elements:  To establish a claim for common law fraud under California law, the Gyde Individuals must prove:

[Intentional Misrepresentation]

(1)     Mr. Esebag represented to the Gyde Individuals that a fact was true;

(2)     That Mr. Esebag's representation was false;

(3)     That Mr. Esebag knew that the representation was false when he made it, or that he made the representation recklessly and without regard for its truth;

(4)     That Mr. Esebag intended that the Gyde Individuals rely on the representation;

(5)     That the Gyde Individuals reasonably relied on Mr. Esebag's representation;

(6)     That the Gyde Individuals were harmed;

(7)     That the Gyde Individuals reliance on Mr. Esebag's representation was a substantial factor in causing their harm.

BARNES & THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

<u>Source:</u>  CACI 1900 Intentional Misrepresentation.

OR

[Concealment]

(1)     That Mr. Esebag and the Gyde Individuals were business partners; or That Mr. Esebag disclosed some facts to the Gyde Individuals but intentionally failed to disclose other facts, making the disclosure deceptive; or

That Mr. Esebag intentionally failed to disclose certain facts that were known only to him and that the Gyde Individuals could not have discovered; or

That Mr. Esebag prevented the Gyde Individuals from discovering certain facts; and

(2)     That the Gyde Individuals did not know of the concealed facts;

(3)     That Mr. Esebag intended to deceive the Gyde Individuals by concealing the facts;

(4)     That had the omitted information been disclosed, the Gyde Individuals reasonably would have behaved differently;

(5)     That the Gyde Individuals were harmed; and

(6)     That Mr. Esebag's concealment was a substantial factor in causing the Gyde Individuals' harm.

<u>Source:</u> CACI 1901 Concealment.

OR

[False Promise]

(1)     That Mr. Esebag made a promise to the Gyde Individuals;

(2)     That Mr. Esebag did not intend to perform this promise when he made it;

(3)     That Mr. Esebag intended that the Gyde Individuals rely on this promise;

9

(4)    That the Gyde Individuals reasonably relied on Mr. Esebag's promise;

(5)    That Mr. Esebag did not perform the promised act;

(6)    That the Gyde Individuals were harmed; and

(7)    That the Gyde Individuals' reliance on Mr. Esebag's promise was a substantial factor in causing their harm.

Source: CACI 1902 False Promise.

**E.    Counter-Claim 6 – Unjust Enrichment.**

Elements: To establish a claim for unjust enrichment under California law, the Gyde Individuals must prove:

(1)    Mr. Esebag received a benefit; and

(2)    Mr. Esebag has unjustly retained the benefit at the expense of the Gyde Individuals.

Source:  *Ever Win Int'l Corp. v. Premier Accessory Grp., LLC*, 2016 WL 11263125, *6 (C.D. Cal. 2016) (Hon. G. Klausner, presiding)

**F.    Counter-Claim 7 – Unfair Competition.**

Elements:  To establish a claim for unfair business practices in violation of California Business and Professions Code section 17200, et. seq. the Gyde Individuals must prove:

(1) A business practice or act by Mr. Esebag;

(2) That is either unlawful, unfair, or fraudulent.

Source:  Cal. Bus. & Prof. Code § 17200 *et seq.*; *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003).

**VIII.    SUMMARY OF MR. ESEBAG'S DEFENSES**

In defense to the Gyde Individuals' claims, Mr. Esebag asserts the parol evidence rule, estoppel, waiver, unclean hands, opinion, statute of frauds, failure to mitigate damages, consent, and business judgment rule.   None of these defenses defeat the Gyde Individuals' claims.

## IX.   CONTENTIONS OF LAW AS TO MR. ESEBAG'S DEFENSES

### A.   Affirmative Defense – Parol Evidence Rule.

The parol evidence rule is not available to Mr. Esebag.  California law makes clear that the Gyde Individuals' very understanding of the MOU should incorporate Mr. Esebag's fraudulent misrepresentations.

In *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, the California Supreme Court overruled prior precedent and reaffirmed the "venerable maxim" that "[p]arol evidence is always admissible to prove fraud, and it was never intended that the parol evidence rule should be used as a shield to prevent the proof of fraud." 55 Cal.4th 1169, 1180-81 (2013).  In *Julius Castle Rest. Inc. v. Payne*, the court held that *Riverisland* was broadly applicable, including "to agreements entered into by sophisticated parties after extensive negotiations." 216 Cal. App. 4th 1423, 1441 (2013) (affirming admission of evidence when defendant-lessor made oral guarantees as to the quality of restaurant equipment but the lease stated that plaintiff-lessees had relied on their own inspection).  Indeed, the California Court of Appeals recently held that extrinsic evidence is more broadly admissible to show that plaintiffs had a different understanding of the contract's terms due to the defendant's fraudulent misrepresentations. *IIG Wireless, Inc. v. Yi*, 22 Cal. App. 5th 630, 644-45 (2018); *see also Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230 (2013) (holding that the trial judge erred in excluding evidence based on the lease's integration clause).  Simply put, the Gyde Individuals are entitled to demonstrate that they entered the MOU based upon Mr. Esebag's fraudulent misrepresentations.

### B.   Affirmative Defense – Estoppel.

Elements: The defense of equitable estoppel consists of the following elements:

(1)    The Gyde Individuals must know the facts;

(2)    The Gyde Individuals must intend that their conduct shall be acted on

11

or must so act that Mr. Esebag has a right to believe the Gyde Individuals so intended;

(3)     Mr. Esebag must be ignorant of the true facts; and

(4)     Mr. Esebag must rely on the Gyde Individuals' conduct to his injury.

Source: *Directors of Motion Picture Industry Pension Plan v. Nu Image Inc.*, 2014 WL 808859,*2 (C.D. Cal. 2014).

**C.     Affirmative Defense – Waiver.**

Elements:   To establish the affirmative defense of waiver, Mr. Esebag must prove:

(1) The Gyde Individuals knew Mr. Esebag was required to do something; and

(2) The Gyde Individuals freely and knowingly gave up their right to have Mr. Esebag perform these obligations.

Source: *Cyclone USA*, 2007 WL 9662337, *20.

**D.     Affirmative Defense – Unclean Hands.**

Elements: To establish the affirmative defense of unclean hands, Mr. Esebag must prove:

(1)     The Gyde Individuals engaged in inequitable conduct; and

(2)     The Gyde Individuals' conduct directly relates to the claim which they have asserted against Mr. Esebag.

Source: *Intamin, Ltd. v. Magnetar Technologies Corp.* 623 F.Supp.2d 1055, 1074 (C.D. Cal. 2009), *aff'd* 404 Fed. Appx. 496 (Fed. Cir. 2010) ("To prove unclean hands, appellate courts have required two things. First, a defendant must prove the plaintiff engaged in inequitable conduct and, second, that the plaintiff's conduct directly relates to the claim which it has asserted against the defendant"); *POM Wonderful LLC v. Coca Cola Company*, 166 F.Supp.3d 1085, 1097 (C.D. Cal. 2016) ("These authorities hold that a defendant can succeed on an unclean hands defense if it proves that a plaintiff engaged in a 'willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct.'")

### E.   Affirmative Defense – Opinion.

Elements: Ordinarily, an opinion is not considered a representation of fact.  An opinion is a person's belief that a fact exists, a statement regarding a future event, or a judgment about quality, value, authenticity, or similar matters. However, Mr. Esebag's opinion is considered a representation of fact if the Gyde Individuals prove that:

(1)   Mr. Esebag claimed to have special knowledge about the subject matter that the Gyde Individuals did not have;

OR

(2)   Mr. Esebag made a representation, not as a casual expression of belief, but in a way that declared the matter to be true;

OR

(3)   Mr. Esebag had a relationship of trust and confidence with the Gyde Individuals;

OR

(4)   Mr. Esebag had some other special reason to expect that The Gyde Individuals would rely on his or her opinion.

Source: CACI 1904 Opinion as Statements of Fact.

### F.   Affirmative Defense – Statute of Frauds.

Elements: The following contracts are invalid unless they, or some note or memorandum thereof, are in writing and subscribed by the party to be charged or by the party's agent:

(1) An agreement that by its terms is not to be performed within a year from the making thereof;

OR

(2) A special promise to answer for the debt, default, or miscarriage of another, except in the cases provided for in Section 2794;

OR

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

(3) An agreement for the leasing for a longer period than one year, or for the sale of real property, or of an interest therein; such an agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent is in writing, subscribed by the party sought to be charged;

OR

(4) An agreement authorizing or employing an agent, broker, or any other person to purchase or sell real estate, or to lease real estate for a longer period than one year, or to procure, introduce, or find a purchaser or seller of real estate or a lessee or lessor of real estate where the lease is for a longer period than one year, for compensation or a commission;

OR

(5) An agreement that by its terms is not to be performed during the lifetime of the promisor;

OR

(6) An agreement by a purchaser of real property to pay an indebtedness secured by a mortgage or deed of trust upon the property purchased, unless assumption of the indebtedness by the purchaser is specifically provided for in the conveyance of the property;

OR

(7) A contract, promise, undertaking, or commitment to loan money or to grant or extend credit, in an amount greater than one hundred thousand dollars ($100,000), not primarily for personal, family, or household purposes, made by a person engaged in the business of lending or arranging for the lending of money or extending credit. For purposes of this section, a contract, promise, undertaking, or commitment to loan money secured solely by residential property consisting of one to four dwelling units shall be deemed to be for personal, family, or household purposes.

Source: Cal. Civ. Code, § 1624.

**G.    Affirmative Defense – Failure to Mitigate Damages.**

Elements:    A  plaintiff  who  suffers  damage  as  a  result  of  either a breach of contract or a tort has a duty:

    (1)    To take reasonable steps to mitigate those damages; and

    (2)    Will not be able to recover for any losses which could have been thus avoided.

Source: *Insurance Company of the State of Pennsylvania v. Citizens of Humanity LLC*, 2014 WL 12689271,*5 (C.D. Cal. 2014); CACI 358 (" If [defendant] breached the contract and the breach caused harm, [plaintiff] is not entitled to recover damages for harm that [defendant] proves [plaintiff] could have avoided with reasonable  efforts  or  expenditures.  You  should  consider  the  reasonableness  of [plaintiff]'s  efforts  in  light  of  the  circumstances  facing  [him/her/it]  at  the  time, including [his/her/its] ability to make the efforts or expenditures without undue risk or hardship. If [plaintiff] made reasonable efforts to avoid harm, then your award should include reasonable amounts that [he/she/it] spent for this purpose.")

**H.    Affirmative Defense – Consent.**

The nature of the consent Mr. Esebag pleads is unclear.  Therefore, elements of the defense cannot be provided at this time.

**I.    Affirmative Defense – Business Judgment Rule.**

Element: The  common  law  business  judgment  rule  has  been  described  as "insulat[ing] from court intervention those management decisions which are made by *directors* in good faith in what the *directors* believe is the organization's best interest." *F.D.I.C. v. Van Dellen*, 2012 WL 4815159, *6 (C.D. Cal. 2012) (citing *Lee v. Interinsurance Exch. of the Auto. Club of S. Cal.,* 50 Cal. App. 4th 694, 714 (1996); *Lamden v. La Jolla Shores Clubdominium Homeowners Ass'n,* 21 Cal. 4th 249, 257 (1999)); *see also Barnes v. State Farm Mut. Auto. Ins. Co.,* 16 Cal. App.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

4th 365, 378 (1993) (describing "a judicial policy of deference to the business judgment of *corporate directors* in the exercise of their broad discretion in making corporate decisions.").

## X.   THE GYDE INDIVIDUALS' KEY EVIDENCE IN OPPOSITION TO MR. ESEBAG'S CLAIMS AND IN SUPPORT OF THIER RELATED AFFIRMATIVE DEFENSES

### A.   Summary of Evidence.

#### i.   The Parties.

The Gyde Individuals are current and former officers and employees of The Gyde Group LLC, an Arkansas limited liability company headquartered in Arkansas. Justin Whaley is CEO of the Gyde Group, and Sean Hatch serves as CFO and general counsel.

Mr. Esebag lives in Bel Air.  For many years, his primary business appears to have been pursuing licensing opportunities relating to the Playboy® brand.  For over a decade, Nicholai Allen served as Mr. Esebag's business associate and right-hand man.

#### ii.   The Pitch of Dr. Boost to the Gyde Individuals.

In late 2016, Mr. Esebag's personal doctor, Maurice Levy, suggested to Mr. Esebag that he create a line of liquid testosterone shots.  The idea for these testosterone shots became the backbone of the proposed Dr. Boost line of supplements.  In December 2016, Mr. Allen had some very preliminary communications with a potential formulator of the shots, but, as Mr. Allen explained, by early 2017, the project was essentially "on ice."

In January 2017, one of the Gyde Individuals, Mr. Redman, contacted Mr. Esebag's brother, Serge Esebag, to discuss an opportunity regarding Playboy condoms.  On January 25, 2017, several of the Gyde Individuals met with Mr. Allen, Jimmy Esebag, and Serge Esebag to discuss that opportunity.

After the January 2017 meeting, Mr. Esebag told Mr. Allen that he believed

the Gyde Individuals were "loaded" and he wanted to convince them to invest in the Dr. Boost product.  At Mr. Esebag's instruction, Mr. Allen procured a number of empty black bottles, which they "whipped up" into supposed samples of Dr. Boost just days before a presentation about Dr. Boost to the Gyde Individuals on February 27, 2017.  The purpose of those samples was to mislead the Gyde Individuals into believing that there actually was a Dr. Boost product at that time.

During the February 2017 meeting, Mr. Esebag presented a PowerPoint to the Gyde Individuals that made it appear that the Dr. Boost product was fully created and ready for the market.  The presentation gave this false impression in various ways, including claiming that Dr. Boost was "voted #1 new product in the world," that it was "Doctor Recommended," and that it contained an "exclusive brand of scientifically proven, premium ingredients" created by a "world class anti-aging specialist."  During that meeting, Mr. Esebag misrepresented:  (1) that Dr. Boost was ready to market (and in fact was already being sold overseas) and (2) that, when Dr. Boost was ready to launch in the United States, he would personally invest $20 million of his own money in a large-scale marketing campaign.

The main constituent of Dr. Boost's "first-of-its-kind" testosterone shot was called "TESTOPHOR."  According to the presentation, the "exclusive blend" in TESTOPHOR "consists of the scientifically proven, premium ingredients."[2]  The presentation emphasized that "The ingredients in TESTOPHOR:

- Increase Testosterone Secretion by the Body
- Increase Sexual Desire (Aphrodisiac)
- Help Erectile Dysfunction"

The presentation included no other ingredients for any Dr. Boost products other than the "exclusive blend" of ingredients contained in TESTOPHOR.

Within weeks of this presentation, however, the TESTOPHOR story told to

[2] In order to avoid sealing this memorandum, the Gyde Individuals have not listed the specific ingredients here.

the Gyde Individuals in February 2017 began to fall apart.  By April 13, 2017, the managing director of Dr. Boost had written an internal e-mail stating that "[i]t is a strong possibility that Dr. Levy is not involved anymore into the Dr.boost [sic] story."  Mr. Esebag confirmed at his deposition that by that time, he knew that there was a strong possibility that Dr. Levy – the "world-class" doctor who had developed TESTOPHOR – was no longer going to be involved with the product.  When asked if he disclosed this information to Mr. Whaley or Mr. Hatch, however, Mr. Esebag stated, "I don't have to."

Throughout March, April, and early May 2017, Mr. Esebag contacted, retained, and rejected several proposed formulators and manufacturers of Dr. Boost (usually firing them after being told that the Dr. Boost formulations he provided would not work).  As of May 3, 2017, Mr. Esebag told a potential manufacturer of Dr. Boost that he was still reformulating the Dr. Boost products.  Throughout this time, however, his message to the Gyde Individuals remained the same:  Dr. Boost was ready to launch in the very near future, and he would back it with a multi-million-dollar advertising campaign.  Mr. Esebag never recanted those representations before the Gyde Individuals' investment.  Had the Gyde Individuals known the truth – that Dr. Boost remained largely just an idea in Mr. Esebag's head and that Mr. Esebag had no money to fund an advertising campaign – they never would have invested in ULG.

### iii.    The Gyde Individuals' Agreement to Invest in ULG.

In May 2017, the Gyde Individuals and Mr. Esebag began serious negotiations regarding the terms of an investment in ULG.  Mr. Esebag agreed that the Gyde Individuals would obtain a 25% equity position in ULG.  Although Mr. Esebag wanted $25 million for the investment, the Gyde Individuals repeatedly made clear to him that they were "currently in a short cash position with respect to all of our businesses as a whole."  As a result, the Gyde Individuals proposed making payments over time, which would be funded through sales of Dr. Boost.  Mr. Esebag agreed to

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

this payment structure.

On May 11, 2017, Mr. Esebag contacted Joseph O'Dea, a self-described "beverage scientist," to replace Dr. Levy.  Compared to Dr. Levy, who had been touted as a "world-class anti-aging specialist and doctor," Mr. O'Dea appears to have no more than a bachelor's degree.  Within three days, on May 14, 2017, Mr. O'Dea had informed Mr. Esebag that one of the three ingredients in TESTOPHOR, "<u>is present on the WADA banned substance list and NSF banned substance list</u>."   Mr. O'Dea went on to recommend removing that ingredient from TESTOPHOR "in order to prevent any possible legal or manufacturing issues down the line."

The next day, the news Mr. Esebag received from Mr. O'Dea about TESTOPHOR became even more dire.  At 1:40 p.m. on May 15, 2017, Mr. O'Dea reported that "I reached out to several GMP manufacturers today and *none of them would touch the supplied pre-mix*" of TESTOPHOR.  As Mr. O'Dea explained, "[Ingredient 1 and 2] are banned by NSF and WADA.  [Ingredient 3] is a boarder line [sic] material not supported by some insurance carriers."  As Mr. Esebag's then-assistant, Mr. Allen, admitted, this information ultimately required reformulation of the Dr. Boost testosterone shot.

After receiving this information from Mr. O'Dea – which made all of the statements in the February 27 presentation regarding TESTOPHOR either completely untrue or highly misleading – Mr. Esebag kept silent.  Indeed, Mr. Esebag admits that he did not disclose this information to the Gyde Individuals because, as he explained, "I didn't have to convey any information, not to Justin Whaley and not to Sean Hatch until we started – first of all, at that time I didn't even have an agreement signed with them."  The only fair reading of this testimony is that Mr. Esebag believed (wrongly) that he was entitled to keep all of this unfavorable information to himself until and unless the Gyde Individuals signed a contract to purchase an equity interest in ULG.

In fact, while omitting to disclose these crucial developments about

TESTOPHOR, Mr. Esebag worked quickly to finalize a sale of ULG securities to the Gyde Individuals. Earlier that day, at 10:55 a.m., Mr. Hatch had e-mailed a proposal whereby the Gyde Individuals would purchase a 25% equity interest in ULG (whose sole asset was Dr. Boost). Mr. Hatch sent a follow-up e-mail shortly thereafter proposing to make an immediate $2.5 million payment, and later payments of an additional $22.5 million, in exchange for a 25% equity interest in ULG. Instead of disclosing the information he received from Mr. O'Dea, at 2:18 p.m. (just 38 minutes after he received Mr. O'Dea's e-mail), Mr. Esebag sent Mr. Hatch an e-mail agreeing to the Gyde Individuals' terms. Six minutes later, at 2:24 p.m., Mr. Allen sent an e-mail to Mr. Hatch with wiring instructions "for todays [sic] payment of the first 2.5M."

During his deposition, Mr. Esebag repeatedly acknowledged that he did not disclose any unfavorable information about Dr. Boost (such as the information he received from Mr. O'Dea) to the Gyde Individuals. As he explained, "I don't have to explain to anyone how I'm doing my product." Or "I didn't have to report to them at all." And, specifically with respect to the information from Mr. O'Dea, he said, "I didn't have to convey any information, not to Justin Whaley and not to Sean Hatch – first of all, at the time I didn't even have an agreement signed with them."

On May 23, 2017, following additional communications between the parties, Mr. Hatch sent to Mr. Esebag an e-mail once again reiterating that "[w]e expect that the future payments would be funded primarily through the 25% ownership interest. Unfortunately, from a current cash position, we are unable to pay more than the $2.5M up front." Mr. Hatch went on to state that he preferred the payments to "run from the date of first sale or the predetermined September 1 launch date because the income generated from Dr. Boost sales will fund the payments." Mr. Esebag never corrected Mr. Hatch's belief that September 1 was the launch date – notwithstanding Mr. Esebag's knowledge that as of May 23 there was no formula, no manufacturer, and no timeline for Dr. Boost. Nor did he dispute that payments would be funded

1  through sales of Dr. Boost.   Instead, Mr. Esebag responded to Mr. Hatch by

2  reiterating that he would spend over $2.5 million "in September alone for advertising

3  and marketing."

4              iv.    The Memorandum of Understanding.

5         On June 23, 2017, the parties executed a memorandum of understanding

6  ("MOU") for the Gyde Individuals' investment in ULG.   The MOU states that the

7  Gyde Individuals will pay the remainder of their $22.5 million investment in Dr.

8  Boost in four payments of $5,625,000 on each of December 1, 2017, March 1, 2018,

9  June 1, 2018, and September 1, 2018.

10        In reaching that agreement, however, the parties understood that those

11 payments were contingent upon sales of Dr. Boost.   As explained above, Mr. Hatch

12 had repeatedly told Mr. Esebag in writing that the Gyde Individuals' ability to fund

13 payments for their investment rested upon sales of Dr. Boost sufficient to make such

14 payments.   The parties also had numerous conversations on this subject.   But given

15 Mr. Esebag's superior knowledge of the status of Dr. Boost at the time of the

16 agreement, he could not possibly have expected that enough product would be sold

17 to support a $5.625 million payment less than five months in the future.   Given his

18 knowledge of how the Gyde Individuals intended to pay for their investment in ULG,

19 moreover, his failure to correct his misleading communications regarding the timing

20 and availability of Dr. Boost was particularly egregious.   At no time between May

21 16, 2017, and June 23, 2017, did any of the Gyde Individuals learn the truth about

22 the information withheld by Mr. Esebag.

23        The MOU also stated that the shares in ULG were unregistered.    That

24 paragraph of the MOU further provided that "[e]ach Buyer represents that (i) it is an

25 'accredited investor' under applicable law [and] (ii) is able to afford to invest in a

26 speculative venture."   Despite the fact that the MOU stated that each of the Gyde

27 Individuals was jointly and severally liable for the entire $25 million purchase price,

28 Mr. Esebag testified that, when the MOU was executed, he was relying solely upon

Justin Whaley's and Ron Whaley's finances and had no idea about whether any of the other Gyde Individuals were in fact accredited investors or could otherwise afford the investment.  In fact, Mr. Esebag admitted at deposition that he did not even know who some of the Gyde Individuals were.  Neither Mr. Hatch nor Mr. Bahn met the legal definition of "accredited investor."

### v.  Mr. Esebag's Attempts to Acquire Additional Funds Before His Scheme Unraveled.

Even after the Gyde Individuals paid $2.5 million as a good-faith payment for their investment in ULG, Mr. Esebag did nothing to live up to his promise that Dr. Boost would soon hit the market.  To the contrary, his additional delays lasted months.  For example, it was not until July 18, 2017 (two months after the Gyde Individuals made their initial payment), that he and Mr. O'Dea first met with Wellington Foods, the eventual bottler for Dr. Boost, and provided formulas that could actually be produced.  Due to the fact that he had just been hired, Mr. O'Dea was unable to provide the required testing for the ingredients in the formulas in a timely manner; as a result, the first batch of the final product (only one million bottles) was not completed until November 2017.

Recognizing that the Gyde Individuals were soon likely to discover the truth about his misrepresentations and omissions, Mr. Esebag set out to get as much money as he could before his scheme unraveled.  On August 2, 2017, Mr. Esebag hosted a meeting at the Peninsula Hotel, ostensibly to discuss the progress of Dr. Boost.  As Mr. Allen admitted, however, the meeting was a dog-and-pony show designed to convince the Gyde Individuals to agree to "some form of sped-up timeline."  A few days later, Mr. Esebag requested that Mr. Allen set up a meeting with the Gyde Individuals at their office in Arkansas.

The day before the August 2017 meeting in Arkansas, Mr. Whaley sent Mr. Esebag an e-mail reiterating what he and Mr. Hatch had said throughout their relationship:  that the Gyde Individuals could not make any payments beyond what

sales of Dr. Boost could fund.  And, because Dr. Boost was not going to be ready by the planned launch date, Mr. Whaley did not believe that they would be able to make another payment before the end of the year.  Mr. Esebag responded by pointing out his own agreement to pay "millions of dollars of my own" for the advertising of Dr. Boost.

During the August meeting in Arkansas and in subsequent telephone calls, the parties reached an agreement on how future payments would take place.  Under that agreement, as Mr. Allen testified, the Gyde Individuals would advance a $1 million payment by October, and then the parties would meet in January 2018 to discuss a schedule for the remaining payments—or, more specifically, "pay a million dollars and then start sales and meet in January about the rest of the payments."  Absent the agreement to renegotiate the remainder of the payment schedule, there would have been no reason for the Gyde Individuals to agree to advance the $1 million payment before it was required under the MOU.

On August 17, 2017, Mr. Esebag's paralegal sent to Mr. Hatch a proposed amendment to the MOU, which simply referenced the advanced $1 million payment.  Mr. Hatch responded by stating that the amendment was incomplete and that "[o]ur understanding is that we will make the $1M payment by October 15th and will do our best to make another payment by the end of the year.  We will meet in January to review sales of Dr. Boost and determine an appropriate payment schedule going forward."  Mr. Hatch requested that Mr. Esebag confirm this agreement.  Mr. Esebag confirmed that they would meet in December or January to discuss changes to the payment schedule and that they were "going forward on the same page."

Contrary to his e-mail, however, in November 2017, Mr. Esebag demanded that the December 2017 payment occur as previously scheduled, notwithstanding the fact the Gyde Individuals had made the required $1 million advanced payment.  After that demand, Dr. Boost ground to a halt.

### B.   Mr. Esebag Claim 1 – Breach of Written Agreement.

Mr. Esebag's claim for breach of contract will fail.  There are three primary reasons.

<u>First</u>, the MOU and subsequent amendment resulted from the misrepresentations and omissions of Mr. Esebag, absent which the Gyde Individuals would not have made the investment, and which entitle them to rescission.  These include, but are not limited to:

- The misrepresentation that Dr. Boost was voted the #1 new product in the world.
- The failure to disclose the termination of Dr. Levy's involvement with the Dr. Boost project.
- The failure to disclose that the three ingredients identified as central to the original Dr. Boost formula would no longer be part of the product.
- The failure to disclose that Joseph O'Dea, the newest formulator of the Dr. Boost product, was only hired on May 13, 2017.
- The failure to disclose that Mr. O'Dea informed Mr. Esebag that the original Dr. Boost formulation disclosed in the February presentation could not be produced.
- The failure to disclose that Wellington Foods was not contacted until May 2017 and not retained by the time of the MOU.
- The failure to disclose that Mr. Esebag did not have his own money to fund the Dr. Boost launch.
- The failure to disclose that Mr. Esebag intended to use the Gyde Individuals' money to fund the Dr. Boost launch.
- The misrepresentation that Mr. Esebag would renegotiate the payment schedule in December 2017, if the Gyde Individuals paid $1,000,000 in October 2017.

Mr. Esebag's misrepresentations and omissions constitute fraud and violate

the California Blue Sky Law.  Under the Blue Sky Law, "[i]t is unlawful for any person to … sell a security in this state … by means of any written or oral communication that includes an untrue statement of material fact or omits to state a material fact necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading."  Cal. Corp. Code. § 25401.  The Gyde Individuals are entitled to rescind the contract upon which Mr. Esebag purports to sue.

Second, the Gyde Individuals may rescind the MOU because it was the result of an illegal sale of unregistered securities.  Mr. Esebag admits that Section 5 of the Securities Act prohibits the sale of unregistered securities unless an exemption applies.  Doc. 63, ¶ 57; *see also S.E.C. v. Murphy*, 626 F.2d 633, 640 (9th Cir. 1980) ("Section 5 of the 1933 Act forbids the offer or sale of unregistered securities in interstate commerce, but [section] 5 does not apply if the securities are exempt from registration as a private offering.") (internal citation omitted).  The exemptions to registration are found at 17 C.F.R. §§ 230.500 *et seq*., referred to as "Regulation D."  Mr. Esebag admits that the exemptions in 17 C.F.R. §§ 230.504 and 505 do not apply.  Doc. 63, ¶ 59.  As a result, the exemption analysis is limited to Rule 506.  Mr. Esebag cannot show that its requirements were met.

Third, Mr. Esebag's breach-of-contract claim fails as a matter of law because the Gyde Individuals made every payment required to be made under the MOU and subsequent amendments before Mr. Esebag filed this action.  As the documents and testamentary evidence uniformly agree, the parties agreed in August 2017 that, if the Gyde Individuals advanced $1 million in October 2017, the parties would meet in December 2017 or January 2018 to discuss future payments for the ULG investment based upon sales of Dr. Boost.  The Gyde Individuals unquestionably lived up to their end of the agreement, making the $1 million payment as scheduled.  Under the parties' agreement, therefore, no further payments were required until and unless the parties renegotiated the payment schedule.  Because that renegotiation was never

completed, the Gyde Individuals were under no obligation to pay *any* additional amounts.  Simply put, there was no breach.

### C.      The Gyde Individuals' Affirmative Defense – Failure to State A Claim Upon Which Relief Can Be Granted.

As discussed in Sections X.B., X.D., and X.E., Mr. Esebag is purporting to sue based on a contract that the Gyde Individuals did not breach and that must be rescinded.  The Gyde Individuals anticipate that Mr. Esebag will not be able to present a jury question on these issues and that the Gyde Individuals will be entitled to judgment as a matter of law.

### D.      The Gyde Individuals' Affirmative Defense – Agreement Void Because Obtained by Fraudulent Means.

As explained in Sections X.A. and X.B., throughout negotiations with the Gyde Individuals, Mr. Esebag made misrepresentations and omissions about Dr. Boost that left the Gyde Individuals believing as follows at the time the parties entered into the MOU:  (1) that Dr. Boost would be ready for market by September 1 and (2) that he would spend $20 million of his own money to advertise Dr. Boost once it was ready to market.  Had the Gyde Individuals known the truth about either of these statements, they would not have invested in ULG.

With respect to the availability of Dr. Boost, Mr. Esebag knew, but failed to disclose, that at the time the MOU was signed Dr. Boost had not even been formulated, nor had a bottler been selected to produce Dr. Boost.  On May 16, 2017, the Gyde Individuals sent to Mr. Esebag a multi-million-dollar payment towards acquiring 25% of the shares of ULG.  By that time, however, Mr. Esebag was in possession of material information contradicting the critical representations regarding Dr. Boost that he had made in February.  Days earlier, Mr. Esebag had replaced Dr. Levy, the co-developer of TESTOPHOR, with Mr. O'Dea, a "beverage chemist" with only a bachelor's degree.  Mr. O'Dea immediately reported to Mr. Esebag that the "scientifically proven, premium ingredients" of TESTOPHOR were

26

banned by regulatory agencies and various insurance companies.  Mr. Esebag, however, chose to allow the Gyde Individuals to purchase their ULG shares while omitting this material information.  Indeed, Mr. Esebag testified at deposition that he was under no obligation to disclose such information until the Gyde Individuals had finalized their investment in ULG.

It was impossible that Dr. Boost would be available by the September 1 launch date anticipated by the Gyde Individuals – a launch date that Mr. Esebag had continually pushed back, but ultimately never past September 1.  In fact, due to the delays that occurred because Mr. O'Dea was hired (without the Gyde Individuals' knowledge) too late in the process to perform necessary ingredient testing in a timely manner, Dr. Boost was not ready until November, months after anticipated and far too late for the Gyde Individuals to make a $5.625 million payment from sales in December.  Instead, Mr. Esebag used this delay to extract an additional $1 million from the Gyde Individuals under the false promise of future negotiations of the payment schedule.

With respect to the advertising for Dr. Boost, the simple fact is that Mr. Esebag did not have the $20 million he promised for advertising.  Instead, as Mr. Allen admitted, the entire Dr. Boost scheme was designed as an opportunity for Mr. Esebag to bolster his failing finances by taking money from the Gyde Individuals, who Mr. Esebag believed were "loaded."  This promised advertising was material to the Gyde Individuals' investment decision, and even Mr. Esebag admitted that the marketing of Dr. Boost "would be very important to its success in the United States."

The Gyde Individuals expect that Mr. Esebag will contend that any claim of fraudulent inducement is barred by the integration clause in the MOU.  But California law, which governs the MOU, makes clear that the Gyde Individuals' very understanding of the MOU should incorporate Mr. Esebag's fraudulent misrepresentations.  In *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, the California Supreme Court overruled prior precedent and reaffirmed

27

the "venerable maxim" that "[p]arol evidence is always admissible to prove fraud, and it was never intended that the parol evidence rule should be used as a shield to prevent the proof of fraud."  55 Cal. 4th at1180-81.  In *Julius Castle Rest. Inc. v. Payne*, the court held that *Riverisland* was broadly applicable, including "to agreements entered into by sophisticated parties after extensive negotiations."  216 Cal. App. 4th 1423, 1441 (2013) (affirming admission of evidence when defendant-lessor made oral guarantees as to the quality of restaurant equipment but the lease stated that plaintiff-lessees had relied on their own inspection).  Indeed, the California Court of Appeals recently held that extrinsic evidence is more broadly admissible to show that plaintiffs had a different understanding of the contract's terms due to the defendant's fraudulent misrepresentations. *IIG Wireless,* 22 Cal. App. 5th at 644-45; *see also Thrifty Payless*, 218 Cal. App. 4th 1230 (holding that the trial judge erred in excluding evidence based on the lease's integration clause).  Simply put, the Gyde Individuals are entitled to demonstrate that they entered the MOU based upon Mr. Esebag's fraudulent misrepresentations.

Mr. Esebag's omission of critical information, moreover, violated the California Blue Sky Law.  Under the Blue Sky Law, "[i]t is unlawful for any person to … sell a security in this state … by means of any written or oral communication that includes an untrue statement of material fact or omits to state a material fact necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading."  Cal. Corp. Code. § 25401.  Having told the Gyde Individuals about the developer of TESTOPHOR and the ingredients of TESTOPHOR, California law imposed on Mr. Esebag the obligation to disclose any material facts necessary to make his statements about TESTOPHOR not misleading.  His omission of the material developments regarding TESTOPHOR violated the Blue Sky Law and entitles the Gyde Individuals to recession of the contract upon which Mr. Esebag purports to sue.  The Gyde Individuals need not prove reliance upon the misrepresentations or omissions. *Bowden v. Robinson*, 67 Cal. App. 3d 705,

15 (4th Dist. 1977) (holding that "proof of reliance is not required"); *Boam v. Trident Fin'l Corp.*, 6 Cal. App. 4th 738, 743 (1st Dist. 1992) (noting that the Act "dispense[s] with the common law element of actual reliance"); *see also Lynch v. Cook*, 148 Cal. App. 3d 1072, 1087 (2d Dist. 1983) (holding that reliance is not required); *Baystar Capital Mgmt. LLC v. Core Pacific Yamaichi Int'l (H.K.) Ltd.*, 2007 WL 9711373, at *4 (C.D. Cal. Apr. 16, 2007) (same); *Russian Hill Capital, L.P. v. Energy Corp. of America*, 2016 WL 1029541, at 7 n.4 (N.D. Cal. Mar. 15, 2016) (same).

Finally, Mr. Esebag also made a material misrepresentation in inducing the Gyde Individuals into amending the MOU in August 2017. Knowing that his scheme was likely coming to an end, he promised the Gyde Individuals that, if they would just give him another million dollars, he would renegotiate the payment schedule in early 2018. Once again, the undisputed testimonial and documentary evidence supports that understanding. But once Mr. Esebag received that $1 million, and Dr. Boost was still not ready for market, he reneged on his agreement and insisted on full payment. Again, had the Gyde Individuals known Mr. Esebag's true intentions, they never would have agreed to advance the additional $1 million.

Each of these misrepresentations and omissions was material and supports voiding the MOU and the subsequent amendment in August 2017.

**E.     The Gyde Individuals' Affirmative Defense – Agreement Void or Voidable Because Shares of ULG Were Not Registered.**

The parties agree that the ULG shares in this case are unregistered. As explained in Section X.B, Section 5 of the Securities Act prohibits the sale of unregistered securities, unless an exemption applies. Mr. Esebag cannot meet his burden to prove that any exemption applies here; as such, the sale of unregistered securities permits rescission and entitles the Gyde Individuals to a complete refund.

F.     **The Gyde Individuals' Affirmative Defense – Excuse of Performance.**

Mr. Esebag failed to honor the payment schedule to which he and the Gyde Individuals had agreed when the Gyde Individuals invested in Dr. Boost.  Mr. Esebag also failed to negotiate the payment schedule after the Gyde Individuals paid him an additional $1,000,000.  Further performance by the Gyde Individuals, therefore, is excused.

G.     **The Gyde Individuals' Affirmative Defense – Waiver.**

Mr. Esebag waived any right he may have had to the payment schedule in the MOU.  Mr. Esebag made clear that he did not intend to enforce the schedule because it was contrary to the parties' agreement.   The parties understood that payments were contingent upon sales of Dr. Boost.   Those sales did not occur.   And the Gyde Individuals advanced $1 million payment in October 2017 pursuant to the parties' agreement to meet in January 2018 to discuss a schedule for the remaining payments—or, more specifically, "pay a million dollars and then start sales and meet in January about the rest of the payments."

XI.    **SUMMARY OF KEY EVIDENCE IN SUPPORT OF THE GYDE INDIVIDUALS' CLAIMS AND IN OPPOSITION TO MR. ESEBAG'S DEFENSES**

A.     **Summary of Evidence.**

The Gyde Individuals incorporate by reference section X.A.

B.     **The Gyde Individuals' Counter-Claim 1 – Violations of §10b of the Securities Exchange Act and Rule 10b-5.**

The Gyde Individuals incorporate by reference Sections X.A., X.B., and X.D. Mr. Esebag's conduct toward the Gyde Individuals was a series of acts and omissions to defraud them out of millions of dollars in connection with Mr. Esebag's sale of ULG stock.   The Gyde Individuals were in Arkansas, and Mr. Esebag was in California.   Mr. Esebag knew the truth, and the Gyde Individuals did not.   His conduct was knowing, and the Gyde Individuals justifiably relied.

BARNES & THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

**C.      The Gyde Individuals' Counter-Claim 2 – Violations of Section 5 and 12 of The Securities Act.**

The Gyde Individuals incorporate by reference Sections X.B. and X.E.  The parties agree that the ULG shares in this case are unregistered.  Section 5 of the Securities Act prohibits the sale of unregistered securities, unless an exemption applies.  Mr. Esebag cannot meet his burden to prove that any exemption applies here; as such, the sale of unregistered securities permits rescission and entitles the Gyde Individuals to a complete refund.

**D.      The Gyde Individuals' Counter-Claim 3 – Violations of Section 25401 of The California Corporations Code.**

The Gyde Individuals incorporate by reference Sections X.A., X.B., and X.D.  Under the Blue Sky Law, "[i]t is unlawful for any person to … sell a security in this state … by means of any written or oral communication that includes an untrue statement of material fact or omits to state a material fact necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading."  Cal. Corp. Code. § 25401.  Mr. Esebag's omission of the material developments regarding TESTOPHOR violated the Blue Sky Law and entitles the Gyde Individuals to recession of the contract upon which Mr. Esebag purports to sue, as well as compensatory and punitive damages.

**E.      The Gyde Individuals' Counter-Claim 5 – Common Law Fraud.**

The Gyde Individuals incorporate by reference Sections X.A., X.B., and X.D.  Mr. Esebag's conduct toward the Gyde Individuals was a series of acts and omissions to defraud them out of millions of dollars in connection with Dr. Boost.  Mr. Esebag knew the truth, and the Gyde Individuals did not.  His conduct was knowing, and the Gyde Individuals justifiably relied.

**F.      The Gyde Individuals' Counter-Claim 6 – Unjust Enrichment.**

The Gyde Individuals incorporate sections X.A., X.B., and X.D.  Mr. Esebag received millions of dollars from the Gyde Individuals based on Dr. Boost—a

BARNES & THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

product that Mr. Esebag represented to exist but did not in fact exist.  Allowing him to retain the millions of dollars obtained through his misrepresentation and omissions would be unjust.

### G.  The Gyde Individuals' Counter-Claim 7 – Unfair Competition.

The Gyde Individuals incorporate sections X.A., X.B., and X.D.  Esebag's business practices were unfair and fraudulent.  California prohibits such practices.

### H.  Mr. Esebag's Affirmative Defense 1 – Parol Evidence Rule.

Mr. Esebag has no basis for asserting the parol evidence rule.  "Parol evidence is always admissible to prove fraud, and it was never intended that the parol evidence rule should be used as a shield to prevent the proof of fraud." *Riverisland*, 55 Cal. 4th at 1180-81.

### I.  Mr. Esebag's Affirmative Defense 2 – Estoppel.

Mr. Esebag's claim of estoppel appears to be based on the contention that the Gyde Individuals knew facts that he did not.  As explained in Sections X.A., X.B., and X.D, just the oppose it true.  The defense is baseless.

### J.  Mr. Esebag's Affirmative Defense 3 – Waiver.

Mr. Esebag appears to contend that the Gyde Individuals gave up their right to have Mr. Esebag perform certain obligations.  To the contrary, Mr. Esebag failed to perform his obligations without the Gyde Individuals' consent as he defrauded them.

### K.  Mr. Esebag's Affirmative Defense 4 – Unclean Hands.

Mr. Esebag has identified no inequitable conduct to support the defense of unclean hands, and there is none.

### L.  Mr. Esebag's Affirmative Defense 5 – Opinion.

Mr. Esebag appears to contend that his statements to the Gyde Individuals were opinions.  As discussed at length in Sections X.A., X.B., and X.D, Mr. Esebag was misrepresenting fact, and the defense is not available.

### M.  Mr. Esebag's Affirmative Defense 6 – Statute of Frauds.

Mr. Esebag's basis for asserting the statute of frauds is unclear.

**N.**   **Mr. Esebag's Affirmative Defense 7 – Failure to Mitigate Damages.**

Mr. Esebag defrauded the Gyde Individuals out of millions of dollars by the time they discovered the fraud.  The Gyde Individuals did not make further payments.  The defense of failure to mitigate damages is not available.

**O.**   **Mr. Esebag's Affirmative Defense 8 – Consent.**

The Gyde Individuals did not consent to any of Mr. Esebag's conduct.  They were victims of fraud.  The defense, though unclear from Mr. Esebag's pleading, is not available.

**P.**   **Mr. Esebag's Affirmative Defense 9 – Business Judgment Rule.**

Mr. Esebag's reason for asserting the business judgment rule is unclear.  Mr. Esebag cannot use the business judgment rule to shelter himself from fraud.  *F.D.I.C. v. Castetter*, 184 F.3d 1040, 1046 (9th Cir. 1999).   The defense is not available.

**XII.**   **ANTICIPATED EVIDENTIARY ISSUES**

Key evidentiary issues will be addressed in the parties' motions in limine.

**XIII.**   **BIFURCATION OF ISSUES**

There are no issues that require bifurcation in this case.

**XIV.**   **STATEMENT AS TO JURY TRIAL**

The Gyde Individuals have demanded a jury trial.

**XV.**   **ATTORNEY'S FEES**

None.

**XVI.**   **ABANDONMENT OF ISSUES**

The Gyde Individuals have abandoned their defense of failure to join necessary parties and their claim for violations of Sections 25110 and 25503 of the California Corporations Code.

1     Dated:  November 18, 2019       **QUATTLEBAUM GROOMS & TULL**

2                                            E.B. Chiles IV
                                           Chad W. Pekron

3                                            R. Ryan Younger

4                                 **BARNES & THORNBURG LLP**

5                                         Kevin D. Rising
                                        Garrett S. Llewellyn

6

7                        By:____ /S/Garrett S. Llewellyn_____
                                     Attorneys for Defendants and

8                                      Counter-Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28